**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Carlos M. Rondon Clavo, | No. CV-24-08025-PCT-KML |
| Plaintiff, | **ORDER** |
| v. | |
| Midwestern University, et al., | |
| Defendants. | |

Plaintiff Carlos M. Rondon Clavo, a physician from Venezuela, made medical mistakes during the second year of his residency at Kingman Regional Medical Center. Defendant Kingman terminated his residency. Dr. Clavo filed this suit claiming the termination was discriminatory and violated his contracts with both Kingman and defendant Midwestern University, the private educational institution that sponsored the residency program. Kingman and Midwestern have each filed motions to dismiss the current complaint. Those motions are granted, but Dr. Clavo may amend three of his claims.

**I.   Factual Background**

Dr. Clavo, who is Hispanic, obtained his medical degree in Venezuela before immigrating to the United States. (Doc. 38 at 3.) After a series of post-doctoral fellowships, in 2019 he matched through the National Resident Matching Program with Kingman Regional Medical Center, a hospital in northern Arizona. (Doc. 38 at 2–4.) Kingman's emergency room residency program is sponsored by Midwestern University, a private

university accredited by the Accreditation Council for Graduate Medical Education ("ACGME"). (Doc. 38 at 4.)

Dr. Clavo was required to sign a "residency employment agreement" that governed the terms of his relationship with Kingman.[1] (Doc. 41-1.) The agreement provided Kingman would "employ" Dr. Clavo as a resident for his PGY-2 year (post-grad-year 2, *i.e.*, the second year following his medical school graduation), from July 1, 2021 to June 30, 2022. (Doc. 41-1.) Under the agreement, Dr. Clavo agreed to care for Kingman patients in exchange for the salary, bonus and benefits explicitly described. (Doc. 41-1 at 3, 7.) Either party could terminate the agreement in various ways. (Doc. 41-1 at 8–9.) Among those, Kingman could immediately terminate Dr. Clavo "for cause" on written notice if he engaged in an act, omission, or pattern of conduct that "pose[d] a danger to patient welfare[.]" (Doc. 41-1 at 8.)

Dr. Clavo's complaint admits he made medical mistakes at Kingman during that PGY-2 year. (Doc. 38 at 8.) In October 2021, he accidentally placed a catheter incorrectly during a central line procedure, but "acted promptly to prevent injury to the patient" and "took full responsibility for the error." (Doc. 38 at 8.) Nonetheless, Kingman placed Dr. Clavo on "remediation," a disciplinary sanction with potential to escalate, requiring him to perform additional procedures under the supervision of defendant Dr. Justina Truong. (Doc. 38 at 2.)

While Dr. Clavo was completing his first period of remediation, he disagreed with his attending physician Dr. Merrill (who is not a named defendant) regarding a

---

[1] Dr. Clavo refers to the operative document as a "residency agreement" and claims Kingman explicitly identifies itself as "the School" in the agreement. (Doc. 38 at 4.) But the document he references and attaches to his complaint is not a residency agreement, nor is Kingman a party to it: it is a "student intern agreement and release" releasing an unnamed company from liability arising from Dr. Clavo's participation in some type of clinical experience involving paramedics. (Doc. 38-1.) Kingman attached the actual residency agreement to its motion to dismiss and asked the court to incorporate it by reference. (Docs. 41 at 5, 41-1.) Dr. Clavo did not oppose Kingman's request or contest the residency agreement's authenticity in his response. (*See* Doc. 44.) Because the complaint refers extensively to the residency employment agreement, it is central to Dr. Clavo's breach-of-contract claim against Kingman, and no party questions its authenticity, the court treats the document as part of the complaint and assumes its contents are true for purposes of the motion to dismiss. *See Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006).

cardiovascular diagnosis. (Doc. 38 at 9–10.) Although Dr. Clavo expressed his opinion "privately and respectfully" and was ultimately correct in the diagnosis, Dr. Merrill chastised him for being "aggressive" and reported him for "insubordination," thereby invoking "racist stereotypes of Hispanic or Latino men[.]" (Doc. 38 at 9–10.) Kingman then placed him on another remediation plan justified by perceived gaps in his medical knowledge. (Doc. 38 at 11.) The second remediation plan required Dr. Clavo to "discuss ALL patient care decisions . . . with an attending physician on the service" until April 1, 2022, and warned that he could be removed from active clinical duties if it appeared at any time that patient safety was compromised. (Doc. 38-1 at 105.)

A month later, in January 2022, Dr. Clavo encountered a patient with a leg fracture and administered a moderate dose of ketamine as an anesthetic, consistent with his PGY-2 status and Kingman policy.[2] (Doc. 38 at 11, 13.) He tried to find attending physician Dr. Jahnny before doing so, but Jahnny was busy attending to other patients and Dr. Clavo decided "time was of the essence" in sedating the patient. (Doc. 38 at 11.) Dr. Jahnny arrived in time to help reduce the fracture and initially complimented Dr. Clavo's work but later claimed Dr. Clavo did not timely inform him about the procedure. (Doc. 38 at 12.)

Kingman terminated Dr. Clavo in a written letter dated February 4, 2022. (Doc. 31-1 at 109.) The letter referenced the fracture reduction, stating Dr. Clavo had "performed another unsupervised procedure without the attending physician's consent while in active remediation for a similar event." (Doc. 31-1 at 109.) The termination letter invoked the paragraph of the resident employment agreement permitting "immediate termination for cause" where a resident's act, omission, or pattern of conduct poses a danger to patient welfare. (Doc. 31-1 at 109.)

Dr. Clavo requested an appeal hearing, which Midwestern administered in

---

[2] Kingman contests Dr. Clavo's assertion that he acted within policy in administering the ketamine and asks for "judicial notice" of its sedation policy. (Doc. 41 at 6.) The sedation policy is not a matter of public record and therefore cannot be judicially noticed without converting the motion to one for summary judgment. *See* Fed. R. Civ. P. 12(d). Unlike for the residency employment agreement, the incorporation-by-reference exception does not apply because the sedation policy is not central to Dr. Clavo's claims and the complaint does not refer to it extensively. *See supra* note 1.

accordance with a written "academic and disciplinary action due process policy." (Docs. 38 at 14, 38-1 at 2.) The appeal committee voted to terminate Dr. Clavo from the residency program on May 20, 2022. (Doc. 38 at 14.)

Nearly nineteen months later, Dr. Clavo filed a complaint in the U.S. District Court for the Northern District of Illinois, which was later transferred to the District of Arizona. (Doc. 18.) Dr. Clavo amended the complaint. (*See* Doc. 38.) The first amended complaint alleges five counts arising from the termination:

1. Title VII discrimination and retaliation based on race and national origin against Kingman;
2. Unlawful discrimination under 42 U.S.C. § 1981 against Kingman and four individually-named physician defendants (Drs. Nelcamp, Sergent, Truong, and Dawson) who participated in supervising and terminating Dr. Clavo;
3. A due process violation under the Fifth and Fourteenth Amendments against Kingman, Midwestern, Dr. Sergent, and Dr. Nelcamp;
4. Breach of contract against Kingman;
5. Breach of contract against Midwestern.

(Doc. 38.)

Kingman and the individually-named physicians are represented by the same counsel, who moved to dismiss all counts alleged against them. (Doc. 41.) Midwestern is represented by a different attorney who moved to dismiss Counts 3 and 5.[3] (Doc. 40.)

**II.   Analysis**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted)). This is not a "probability requirement," but a requirement that the factual allegations show "more than a sheer possibility that a defendant has acted

---

[3] Midwestern mistakenly refers to "Count IV" throughout its motion but makes clear it is moving to dismiss the breach-of-contract claim against it, which is Count 5. (Doc. 40 at 1, 4-8.)

- 4 -

unlawfully." *Id.* A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[D]etermining whether a complaint states a plausible claim is context specific, requiring the reviewing court to draw on its experience and common sense." *Id.* at 663–64.

**III.   Employment and Contractual Discrimination Claims (Counts 1 and 2)**

Kingman purported to terminate Dr. Clavo based on his medical mistakes. Acknowledging he made these mistakes, Dr. Clavo's complaint alleges Kingman nonetheless had a discriminatory motive for terminating his contract—that he is Venezuelan and Hispanic—as shown by Dr. Truong invoking racist stereotypes in describing him as "aggressive" and Kingman treating him differently from other residents who made similar mistakes. (Doc. 38 at 9–11.) The Kingman defendants move to dismiss Counts 1 and 2 based on a lack of causation, arguing Dr. Clavo cannot show discrimination motivated his termination given the complaint's admission to the same medical mistakes Kingman cited as justification for firing him. (Doc. 41 at 7–10.)

A plaintiff alleging employment discrimination under Title VII must plausibly plead facts showing his protected trait was a "motivating factor" in the alleged adverse employment practice. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 657 (2020). Under this standard, an employer violates Title VII when it "intentionally fires an individual employee based in part" on a protected characteristic, even if "other factors besides the plaintiff's [protected characteristic] contributed to the decision." *Id.* at 659. The plaintiff's protected characteristic "need not be the sole or primary cause of the employer's adverse action." *Id.* at 665. So, even if medical mistakes were the main reason Kingman terminated Dr. Clavo's residency, he would sufficiently plead causation under a Title VII disparate-treatment theory by alleging facts suggesting race and national origin were *also* motivating factors in the decision.

As part of its causation argument, Kingman also urges dismissal of the discrimination claims because Dr. Clavo has not alleged facts suggesting that defendant

- 5 -

Dr. Nelcamp, the actual decisionmaker on the termination, was motivated by discriminatory animus. (Doc. 38 at 9.) But if Dr. Clavo were to allege facts permitting an inference that Dr. Truong, his supervisor, was motivated by bias and she influenced or participated in the remediations that gave rise to Dr. Nelcamp's ultimate termination decision, that may be sufficient. *See Poland v. Chertoff*, 494 F.3d 1174, 1182–83 (9th Cir. 2007) (collecting cases holding that a subordinate's bias may be imputed to the decisionmaker where the adverse action relies on factors influenced by the subordinate). Kingman's request to dismiss based on Dr. Nelcamp's personal lack of discriminatory animus is therefore rejected.

Kingman's Title VII causation arguments ask too much of the complaint, but its final argument—that Dr. Clavo has not alleged facts supporting that the comparator residents were similarly-situated in having made comparably-serious mistakes, nor that they were outside of his protected class (Doc. 41 at 10–11)—is well-taken. A plaintiff bringing a disparate treatment claim must allege facts plausibly "giv[ing] rise to an inference of unlawful discrimination," either through "direct or circumstantial evidence of discriminatory intent" or because "similarly situated individuals outside [his] protected class were treated more favorably[.]" *Freyd v. Univ. of Ore.*, 990 F.3d 1211, 1228–29 (9th Cir. 2021); *see Sillah v. Burwell*, 244 F. Supp. 3d 499, 512 (D. Md. 2017) (plaintiff need not make comparator allegations if other facts give rise to inference of discrimination, but must show comparator was similarly situated in all relevant aspects where she does make such allegations). The first amended complaint apparently attempts to do both. (*See* Doc. 38 at 9 (Drs. Truong and Merrill described Dr. Clavo as "aggressive," thereby "invoking racist stereotypes of Hispanic or Latino men, harkening unsubstantiated inferences of aggression or machismo"); 10 (he reported stereotyping to no avail); 10 (he was treated differently from peers who misdiagnosed patients but received "feedback with an emphasis on education or learning opportunities" instead of discipline).)

Dr. Clavo's allegation that his supervisors called him "aggressive" does not by itself give rise to an inference of unlawful discrimination, and his allegations regarding

comparator residents suffer from fatal flaws. To show a comparator is similarly situated, a plaintiff must allege "they have similar jobs and display similar conduct." *Vasquez v. Cnty. of L.A.*, 349 F.3d 634, 641 (9th Cir. 2003) (footnote omitted). This includes engaging in "problematic conduct of comparable seriousness" to the plaintiff's. *Id*. Although Dr. Clavo alleges the comparator residents "misdiagnosed patients," this is not problematic conduct of comparable seriousness to that which Kingman argues justified his termination, namely the botched catheterization, multiple specified deficiencies in managing patient care, and performing an unsupervised sedation procedure without an attending physician present while in active remediation. (Doc. 38-1 at 101–09.) Also, neither Dr. Clavo's complaint nor his response to the motion to dismiss address whether the comparator residents were outside of his protected classes. Count 1 is therefore dismissed. *See Bastidas v. Good Samaritan Hosp. LP*, 774 F. App'x 361, 363–64 (9th Cir. 2019).

Count 2 alleges a claim for racial discrimination in contracting under 42 U.S.C. § 1981. This statute's causation requirement is more rigorous than for a Title VII disparate-treatment claim and requires Dr. Clavo to "initially plead and ultimately prove that, but for race, [he] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Assoc. of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020). Nonetheless, racial animus need not be "the *sole* reason" for an adverse contractual action. *Sharifi Takieh v. Banner Health*, 515 F. Supp. 3d 1026, 1045–46 (D. Ariz. 2021), *aff'd sub nom. Takieh v. Banner Health*, No. 21-15326, 2022 WL 474170 (9th Cir. Feb. 16, 2022). That "a defendant has mixed motives—i.e., legitimate and illegitimate reasons for an alleged act—does not, in and of itself, render a § 1981 claim implausible." *Id*. at 1045 (footnote omitted). Thus, if Dr. Clavo had alleged that non-Hispanic residents who had "'similar jobs and displayed similar conduct,' including 'engag[ing] in problematic conduct of comparable seriousness[,]'" were not terminated, his § 1981 claim could potentially survive at this early stage. *Bastidas*, 774 F. App'x at 363–64 (quoting *Vasquez*, 349 F.3d at 641); *see Sharifi Takieh*, 515 F. Supp. 3d at 1045 (noting § 1981's but-for causation standard could plausibly have been met if plaintiff had alleged defendant would not have revoked non-Arab

physician's privileges despite similar problems).

As discussed above, Dr. Clavo did not allege those or similar facts. The complaint makes the bare assertion that other residents who made medical mistakes were treated differently (Doc. 38 at 10, 13), but nowhere provides facts supporting that their conduct was comparably serious to Dr. Clavo's, nor even that the comparator residents were not Hispanic. Count 2 is therefore also dismissed.

Because Dr. Clavo may be able to allege additional facts regarding discriminatory intent and the comparator residents that would plausibly support his Title VII and 42 U.S.C. § 1981 claims, he is granted leave to amend Counts 1 and 2. *See* Fed. R. Civ. P. 15(a)(1)(2).

### IV.    Due Process Violation Claim (Count 3)

Count 3 asserts a due process claim directly under the Fifth and Fourteenth Amendments alleging Kingman, two physician defendants, and Midwestern deprived Dr. Clavo of his liberty and property interests in his reputation and medical license. (Doc. 38 at 17–18.) Dr. Clavo admits 42 U.S.C. § 1983 is the proper vehicle for these claims and asks the court to imply that statute into his complaint. (Doc. 44 at 8–9.) So construed, the § 1983 claim is dismissed because none of the named defendants are state actors.

To establish liability under § 1983, a plaintiff must show the deprivation of a right secured by the Constitution and laws of the United States "committed by a person acting under color of state law." *Chudacoff v. Univ. Med. Ctr. of S. Nev.*, 649 F.3d 1143, 1149 (9th Cir. 2011) (simplified). In other words, "the conduct allegedly causing the deprivation of a federal right [must] be fairly attributable to the State." *Caviness v. Horizon Cmty. Learning Ctr., Inc.*, 590 F.3d 806, 812 (9th Cir. 2010) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)). No matter how wrong their conduct, private entities can only be subject to § 1983 liability under a state action theory. *Heineke v. Santa Clara Univ.*, 965 F.3d 1009, 1012 (9th Cir. 2020).

The complaint alleges Kingman and Midwestern are state actors based on their receipt of federal funds from the Center for Medicare and Medicaid Services. (Doc. 38 at 18.) The Ninth Circuit has squarely rejected that theory as to both private hospitals and

private universities like those here. *Id.* at 1013–14 (holding university's receipt of government funds, compliance with generally-applicable laws, and being subject to penalties such as loss of funding are all "insufficient to convert private action into that of the state"); *Chudacoff*, 649 F.3d at 1149 (distinguishing public hospital, which may be liable under the Fourteenth Amendment for physician credentialing decisions, from private hospitals whose only links to the state are the receipt of federal funds or being subject to state regulation). So too have other courts around the country, including in the employment-at-a-private-hospital situation present here. *See, e.g.*, *Beckerich v. St. Elizabeth Med. Ctr.*, 563 F. Supp. 3d 633, 639 (E.D. Ky. 2021) ("Private hospitals, no matter how much federal funding they may receive, are generally not state actors for purposes of constitutional questions."); *McDaniel v. Loyola Univ. Med. Ctr.*, No. 13-CV-06500, 2014 WL 4269126, at *9 (N.D. Ill. Aug. 28, 2014); *Jackson v. E. Bay Hosp.*, 980 F. Supp. 1341, 1356 (N.D. Cal. 1997). Count 3 is therefore dismissed.

**IV.   Breach of Contract Claims (Counts 4 and 5)**

The complaint asserts a breach-of-contract claim against Kingman in Count 4 and against Midwestern in Count 5. Defendants move to dismiss these claims for slightly different reasons, Kingman arguing that the residency employment agreement is the operative contract and triggers Arizona's one-year statute of limitations for claims alleging breaches of employment contracts (Doc. 41 at 13-14) and Midwestern arguing the due process policy Dr. Clavo invokes is not a valid contract at all (Doc. 40 at 4-9).

In Arizona, a plaintiff alleging breach of contract must allege facts establishing the existence of a valid and enforceable contract, how that contract was breached, and the damages he suffered. *Thomas v. Montelucia Villas, LLC*, 302 P.3d 617, 621 (Ariz. 2013) (recognizing elements of breach-of-contract claim). For an enforceable contract to exist, there must be an offer, an acceptance, and consideration, with "consideration" defined as "a benefit to the promisor or a loss or detriment to the promisee[.]" *K-Line Builders, Inc. v. First Fed. Sav. & Loan Ass'n*, 677 P.2d 1317, 1320 (Ariz. Ct. App. 1983). Arizona law imposes a one-year statute of limitations in which to bring actions alleging "breach of

an . . . employment contract including contract actions based on employee handbooks or policy manuals that do not specify a time period in which to bring an action." A.R.S. § 12-541(3).

Count 4, Dr. Clavo's breach-of-contract claim against Kingman, is dismissed under this statute of limitations. His residency employment agreement with Kingman, which spells out Dr. Clavo's duration and conditions of employment, salary, and benefits (*see* Doc. 41-1), is a written employment contract to which the one-year limitations period applies. *See Lytikainen v. Schaffer's Bridal LLC*, 409 F. Supp. 3d 767, 774 (D. Ariz. 2019) (an employment contract is one "between an employer and employee in which the terms and conditions of employment are stated" and includes all contracts "related to 'the nature, conditions, or duration' of employment") (quoting *Redhair v. Kinerk, Beal, Schmidt, Dyer & Sethi, P.C.*, 183 P.2d 544, 546, 548–49 (Ariz. Ct. App. 2008)). And Dr. Clavo makes no argument to the contrary, instead focusing solely on the word "student" in a "student intern release and agreement" he made with an unnamed company that is not Kingman and therefore cannot support his breach-of-contract claim against it (Doc. 44 at 9–10). *See supra* note 1.

Section 12-541(3)'s one-year statute of limitations starts when a plaintiff "knows or, in the exercise of reasonable diligence, should know the facts underlying the cause [of action]." *See Gust, Rosenfeld & Henderson v. Prudential Ins. Co. of Am.*, 898 P.2d 964, 966 (Ariz. 1995). In employment breach-of-contract actions based on a termination, that is the date the employment relationship ended. *Lytikainen*, 409 F. Supp. 3d at 777. Kingman terminated Dr. Clavo on February 4, 2022 (Doc. 38-1 at 109), but he did not file suit until twenty months later, on December 14, 2023 (Doc. 1). Count 4 is therefore dismissed under A.R.S. § 12-541(3).

Dr. Clavo's breach-of-contract claim against Midwestern is also dismissed but for a different reason. The "contract" Dr. Clavo alleges was breached in Count 5 was Midwestern's "Academic and Disciplinary Action 'Due Process' Policy." (Docs. 38 at 19–20, 38-1 at 2–9.) This document is not an enforceable contract and is not supported by

consideration in the form of any obligation on Dr. Clavo's part. *See Wagenseller v. Scottsdale Mem'l Hosp.*, 710 P.2d 1025, 1038 (Ariz. 1985) (distinguishing between policy statements and contracts, and analyzing conditions under which policy statements may be incorporated into contracts); *Carroll v. Lee*, 712 P.2d 923, 926 (Ariz. 1986) ("Mutuality of obligation is a requirement for a valid contract[.]"). The policy doesn't even mention Dr. Clavo's name, let alone hint at a promise or detriment on his behalf, and Dr. Clavo's complaint and briefing do not add coherence to the consideration question. *See Castrillon v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 51 F. Supp. 3d 828, 842–43 (S.D. Ind. 2014) (holding medical resident had not identified a contract for purposes of her breach-of-contract claim where she relied on ACGME due process standards, which are "akin to regulations established by an administrative body, rather than a contract governing the relationship between two entities."); *Mares v. Miami Valley Hosp.*, 671 F. Supp. 3d 812, 818 (S.D. Ohio 2023) (in the medical residency context, distinguishing between employment contract with hospital, enrollment contract with academic program, and manual spelling out academic discipline process). Because the complaint does not contain allegations plausibly establishing the existence of a valid and enforceable contract between Dr. Clavo and Midwestern, Count 5 is dismissed. However, because Dr. Clavo may be able to point to some other valid agreement governing his relationship with Midwestern, he may amend Count 5.

## V.     Leave to Amend

As discussed above, Dr. Clavo is granted leave to amend the discrimination claims alleged in Counts 1 and 2 and the breach-of-contract claim against Midwestern in Count 5. But a court need not grant leave to amend when it is clear that any amendment would be futile. *See In re Cloudera, Inc.*, 121 F.4th 1180, 1190 (9th Cir. 2024). Given the reasons for dismissal, that is the situation with Counts 3 and 4. *See, e.g.*, *Deutsch v. Turner Corp.*, 324 F.3d 692, 718 & n.20 (9th Cir. 2003) (amendment would be futile where claim was time-barred); *Ismail v. Cnty. of Orange*, 693 F. App'x 507, 512 (9th Cir. 2017) (amendment would be futile as to defendants who were not state actors). Dr. Clavo may therefore amend

Counts 1, 2, and 5 only.

VI. **Conclusion**

Both motions to dismiss are granted and all counts in the first amended complaint dismissed. Dr. Clavo may amend his claims for employment discrimination under Title VII, discrimination in contracting under 42 U.S.C. § 1981, and breach of contract against Midwestern only.

Accordingly,

**IT IS ORDERED** the motions to dismiss (Docs. 40, 41) are **GRANTED**. The due process claim and breach of contract claim against Kingman are **DISMISSED WITHOUT LEAVE TO AMEND**. The Title VII, 42 U.S.C. § 1981, and breach of contract claim against Midwestern are **DISMISSED WITH LEAVE TO AMEND**.

**IT IS FURTHER ORDERED** no later than **April 1, 2025**, plaintiff shall file an amended complaint consistent with this order. The Clerk of Court is directed to enter a judgment of dismissal with prejudice in the event no amended complaint is filed by that date.

Dated this 18th day of March, 2025.

Honorable Krissa M. Lanham
United States District Judge